UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. _____-CIV_____

STARMARK FINANCIAL LLC,

    Plaintiff,

vs.

LUTHER APPLIANCE & FURNITURE
SALES ACQUISITION LLC,

    Defendant.
_____/

## VERIFIED COMPLAINT

Plaintiff, Starmark Financial LLC ("Starmark"), hereby sues Defendant, Luther Appliance & Furniture Sales Acquisition LLC ("Luther").

### JURISDICTION AND VENUE

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. This is an action for breach of contract, conversion, and injunctive relief exceeding $75,000 in controversy, exclusive of costs, interest, and fees. Complete diversity of citizenship exists between the parties.

2. Starmark is a Florida limited liability company with its principal place of business located at 800 Fairway Drive, Suite 190, Deerfield Beach, FL 33441. The sole member of Starmark, Brett Silver, is a citizen of Florida.

3. Luther is a Delaware limited liability company with its principal place of business located at 560 Broadhollow Road, Suite 312, Melville, NY 11747. The sole member of Luther is Prosperitas Partners LLC ("Prosperitas"), a Wyoming limited liability company.

4. Venue is proper because a substantial part of the events giving rise to the claims occurred in the Southern District of Florida. 28 U.S.C. § 1391(b).

5. Starmark retained undersigned counsel and is obligated to pay said counsel a reasonable fee for services rendered on its behalf.

6. All conditions precedent to this action have occurred or were waived by Luther.

**GENERAL ALLEGATIONS**

Luther's Business Model

7. Luther is a retail seller of merchandise. However, Luther is somewhat unique because it primarily serves government employees.

8. Once purchases are made, Luther enters into sales finance contracts with the consumers and payments are made via payroll deduction.

9. So long as the consumer remains employed, payments are deducted automatically from the consumer's payroll and forwarded to Luther's holding account.

10. Luther maintains a system on which payments are recorded.

The Contract

11. In December 2022, Starmark entered into an agreement (the "Contract") with Luther for the purchase of approximately ninety percent (90%) of Luther's account receivables (the "accounts") for the sum of Five Million One Hundred Sixty-Four Thousand Three Hundred Thirty-Three Dollars and 15/100 ($5,164,333.15). See Purchase Agreement, **Exhibit 1**.

12. These accounts were a combination of charged-off debt and performing accounts.

13. Although Starmark purchased the accounts, Starmark and Luther further agreed that Luther would continue to service the performing accounts by processing consumer payments and performing billing services.

14. Additionally, Luther and Starmark agreed that Luther would offer performing accounts to Starmark for sale on a monthly basis.

15. Pursuant to the Contract, Starmark had legal ownership over consumer payments received by Luther stemming from Starmark-owned accounts.

16. During the duration of the Contract, Luther regularly remitted funds to Starmark. Luther also provided account-level information to Starmark which indicated payments made, outstanding balances, delinquency, and other pertinent financial data.

17. At various times during this relationship, Starmark exercised its purchase option, while at other times Starmark elected not to exercise this option.

Acquisition by Prosperitas and Luther's Insolvency

18. In March 2023, Prosperitas became sole owner of Luther.

19. Prosperitas appointed Brad Powers, a member of Prosperitas, as CEO.

20. Others subsequently involved in Luther operations were also Propseritas members.

21. As CEO, Mr. Powers took the lead with regard to the relationship with Starmark.

22. On or about October 9, 2024, Starmark was informed that Mr. Powers was deceased.

23. It was eventually revealed to Starmark that Mr. Powers' death was by suicide. It also became apparent that some level of fraud had been committed by Luther under his leadership.

24. Fred Larcombe, the CFO of Luther, conducted daily calls to advise Starmark of Luther's insolvency and inability to continue to operate.

25. At various times during the two weeks following notification of Mr. Powers' death, members of Prosperitas were present on the daily calls, including:

   a. Fred Larcombe (CFO of Luther, Managing Member of Prosperitas, 12.63% Membership Interest in Prosperitas);

   b. Ronald Woessner (Member of the Texas Bar Association, General Counsel for

   Luther, 10% Membership Interest in Prosperitas); and

 c. Vasant Nanavati (12.63% Membership Interest in Prosperitas via Ownership of 9th Planet Partners LLC, a New York limited liability company).

26. On or about October 30, 2024, Prosperitas appointed an interim officer, Chirag Chiman, to facilitate a winding down of Luther through either a voluntary dissolution or bankruptcy proceeding. See Email Appointing Manager, **Exhibit 2**.

Termination of Contract

27. Based in part on Luther's representations that it was unable to service consumer accounts in accordance with the Contract and applicable state and federal regulations, Starmark terminated its servicing relationship with Luther.

28. Starmark later requested Luther turn over payments from the accounts receivable and associated account-level financial information.

29. Prosperitas, through its ownership group and on behalf of Luther, refused to turn over payments from the accounts owned by Starmark. Additionally, Prosperitas refused to provide Starmark with corresponding financial data necessary for Starmark to service the accounts in compliance with state and federal law.

30. Since being appointed, Mr. Chiman has maintained Luther's refusal to provide the payment data nor remit the funds to Starmark, despite Starmark's repeated demands for both.

31. Starmark owns the consumer funds Luther refuses to hand over to Starmark, jeopardizing Starmark's ability to service the accounts it owns and steering Starmark to run afoul of state and federal reporting laws relating to *inter alia* credit reporting, billing, and record retention.

32. Mr. Chiman has expressed an intent to use Starmark's consumer payments to satisfy

the claims of its other creditors (at Starmark's expense) or to use the accounts as collateral.

33. In a November 2024 email, Mr. Chiman wrote to Starmark that Luther was accruing "unearned" payments from consumers, that there was no "process to segregate these unearned payments," that Luther made no effort to inform consumers to cease unearned payments, that continuing operations would cause "irreparable harm to consumers," and that Starmark's funds were not properly segregated from these unearned payments. See Email from Manager, **Exhibit 3**.

34. In that same November 2024 email, Mr. Chiman admitted that he was not qualified to continue operating Luther, even asking for outside ideas, yet he has endeavored to remain in charge of Luther. See Ex. 3.

35. Mr. Chiman's admissions and behavior suggest financial mismanagement and possible fraud within Luther.

**COUNT I—BREACH OF CONTRACT**

36. Starmark incorporates by reference the allegations set forth in Paragraphs 1 through 35, as if set forth herein.

37. The Purchase Agreement was a valid contract between Starmark and Luther.

38. Luther materially breached the Purchase Agreement by:

   a. failing to remit to Starmark the balance of the subject accounts,

   b. using Starmark funds to satisfy Luther's unrelated debts with creditors, including using Starmark's accounts as collateral,

   c. failing to service the subject accounts in compliance with applicable state and federal regulations, and

   d. failing to segregate and maintain Starmark's funds in a designated trust account.

39. Starmark suffered—and continues to suffer—damages a result of Luther's breach.

40. Starmark conferred a benefit on Luther when it paid the purchase price for the account receivables.

41. Luther has knowledge of this benefit, as evidenced by Luther's express intent to misappropriate the account receivables to satisfy its unrelated debts to creditors.

42. Despite Starmark's repeated demands to return the subject account information and funds, Luther refused and instead chose to retain the subject account information and funds for its own benefit and use.

43. Under these circumstances, it would be inequitable for Luther to retain the benefits conferred to it by Starmark without paying fair value.

WHEREFORE, Starmark demands judgment against Luther, an award of damages, restitution, specific performance, and any other relief the Court deems appropriate.

### COUNT II—CONVERSION

44. Starmark incorporates by reference the allegations set forth in Paragraphs 1 through 35, as if set forth herein.

45. Starmark's funds due are specific and identifiable money tied to specific consumer and Luther accounts Starmark purchased for the sum of Five Million One Hundred Sixty-Four Thousand Three Hundred Thirty-Three Dollars and 15/100 ($5,164,333.15) and currently owns.

46. Starmark has an immediate right to possess that money under the Agreement.

47. Luther is not authorized to use the money as collateral, to settle Luther's debts with its creditors, or to otherwise misappropriate or withhold the money. These actions deprived Starmark of its money.

48. Starmark has demanded Luther return the money.

49. Luther refused all demands to return the money.

WHEREFORE, Starmark demands judgment against Luther, an award of damages, and any other relief this Court deems appropriate.

### COUNT III—INJUNCTIVE RELIEF[1]

50. Starmark incorporates by reference the allegations set forth in Paragraphs 1 through 35, as if set forth herein.

51. Starmark has a substantial likelihood of success on the merits.

52. A substantial threat of irreparable injury to Starmark exists if an injunction is not granted.

53. Without injunctive relief Starmark will be unable to meet federal and state collections reporting requirements and will permanently lose access to the consumer accounts it owns.

54. Starmark is primarily a purchaser of debt portfolios. Starmark will lose its entire business if it cannot meet the federal and state licensing and compliance requirements necessary to operate and maintain its business activities related to accounts it owns purchased from Luther and others.

55. The threatened injury to Starmark substantially outweighs the harm an injunction may cause Luther.

56. The requested injunctive relief would not disserve the public interest. To the contrary, an injunction would protect the public interest by preventing consumer funds from being misused or mishandled by Luther. Luther's acting CEO admitted that he is not qualified to make decisions to prevent further harm. See Ex. 3.

57. Starmark has no adequate remedy at law.

---

[1] Starmark is also filing a Motion for Temporary Restraining Order and Preliminary Injunction.

WHEREFORE, Starmark requests the Court enter a temporary restraining order, preliminary injunction, and permanent injunction to freeze Luther's assets and halt any transaction, transfer, or use relating to the subject accounts, financial information, and Starmark's funds.

## RELIEF SOUGHT

WHEREFORE, Starmark demands judgment on all Counts of this Complaint and an award of equitable relief and monetary relief against Defendant as follows:

a. Pursuant to Fed. R. Civ. P. 65(b), entry of a temporary restraining order freezing Luther's assets and restraining Luther, its agents, representatives, servants, employees, and all those acting in concert or participation therewith, from conducting any transactions, sales, transfers relating to Starmark's accounts, and from using the subject accounts, funds, and financial data in any way.

b. Pursuant to Fed. R. Civ. P. 65(a), entry of preliminary and permanent injunctions freezing Luther's assets and enjoining Luther, its agents, representatives, servants, employees, and all those acting in concert or participation therewith, from conducting any transactions, sales, or transfers relating to Starmark's accounts, and from using the subject accounts, funds, and financial data in any way.

c. Pursuant to Fed. R. Civ. P. 53, entry of an order appointing a special master to oversee Luther's operations and winding down.

d. Entry of an order requiring Luther to be subject to an accounting for all its transactions, finances, books, and records.

e. Entry of an order requiring Luther to provide Starmark with full, unimpeded access to Luther's books and records for purposes of inspection.

f. Entry of an order compelling Luther to turn over all information and data associated

    with, corresponding to, or relating to, accounts owned by Starmark.

g. An award of compensatory damages, plus pre- and post-judgment interest.

h. An award of equitable restitution, plus pre- and post-judgment interest.

i. Entry of an order imposing a constructive trust over the subject account funds.

j. An award of reasonable attorney's fees and costs.

k. Any other relief the Court deems appropriate.

## JURY TRIAL DEMAND

Starmark demands a jury trial on all counts so triable.

## VERIFICATION

Ken Annarelli, CFO of Starmark, has reviewed the above allegations and declares under penalty of perjury that the foregoing is true and correct to the best of his information, knowledge, and belief. See Annarelli Affidavit, **Exhibit 4**.

DATED: December 16, 2024.

                                                              Respectfully submitted,

                                                              **GRANER & PLATZEK, P.A.**

                                        By: \s\ Thomas U. Graner
                                               Thomas U. Graner
                                               Florida Bar No.: 905577
                                               tom@granerlaw.com
                                               Alexander K. Beg
                                               Florida Bar No.: 1042019
                                               alex@granerlaw.com
                                               Eric R. Kemper
                                               Florida Bar No.: 1038633
                                               eric@granerlaw.com
                                               1699 S. Federal Highway
                                               Boca Raton, Florida 33432
                                               (561) 750-2445 Telephone
                                               (561) 750-2446 Facsimile

                                      *Attorneys for Plaintiff, Starmark Financial, LLC*